Civil No. 12-2802 (RHK/FLN)

Steven D. Ward,

        Plaintiff,

    v.                          **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Acting Commissioner of Social Security,

        Defendant

_____

Steven D. Ward, *pro se*

Ana H. Voss, Assistant United States Attorney, for Defendant

_____

      Plaintiff Steven D. Ward seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who found Plaintiff was not disabled from his alleged onset date

of August 24, 2007 through the date of the decision. The matter was referred to the undersigned

United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and

Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).

Defendant submitted a motion for summary judgment, and Plaintiff filed a *pro se* motion and

memorandum, which the Court construes as a motion for summary judgment. [Doc. Nos. 11, 12, 15.]

For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment

be denied and Defendant's motion for summary judgment be granted.

_____

[1] Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant
pursuant to Fed. R. Civ. P. 25(d).

1

# I.   INTRODUCTION

Plaintiff protectively filed an application for disability insurance benefits on April 28, 2010, alleging a disability onset date of August 24, 2007.  (Tr. 130-31 [Doc. No. 9].)  His application was denied initially and upon reconsideration.  (Tr. 63-67, 69-71.)  He requested a hearing before an ALJ, and the hearing was held on November 17, 2011.  (Tr. 73-74, 25-54.)  The ALJ denied Plaintiff's application for benefits on November 25, 2011.  (Tr. 9-24.)  The Appeals Council then denied Plaintiff's request for review.  (Tr. 1-7.)  Plaintiff filed a complaint for judicial review in this Court on November 2, 2012.  The matter is now before this Court on cross-motions for summary judgment.

# II.   STATEMENT OF FACTS

## A.   Employment History

Plaintiff worked as a supervisor at a parking ramp from 1995 through 2000.  (Tr. 182.)  From September 2000 through September 2008, Plaintiff worked as a production assistant at a printing company.  (Tr. 182.)  Plaintiff suffered a repetitive stress injury at work on August 24, 2007.  (Tr. 233-234, 273.)  He returned to work with restrictions but on August 24, 2008, his employer could no longer accommodate his work restrictions.  (Tr. 145.)  Plaintiff has not worked since then.  (*Id.*)

## B.   Medical Records

In May 2006, prior to the alleged onset date, Plaintiff underwent anterior cervical discectomy and fusion ("ACDF") to relieve neck pain.  (Tr. 272.)  The surgery was successful, and one year later Plaintiff told his surgeon, Dr. Michael Smith, he had only intermittent aches, pains and occasional twinges.  (*Id.*)  On August 24, 2007, Plaintiff hurt his left arm and groin while working on a sorting machine at work.  (Tr. 233.)  Five days later, Plaintiff told Dr. Phuc Tran at Hiawatha Fairview Clinic that he was experiencing neck pain with radiation down the arms caused by lifting at work.  (Tr. 502.)

Plaintiff appeared to be in mild to moderate pain. (*Id.*) Plaintiff's neurological testing was normal, but he was tender over the neck, shoulders and upper back. (*Id.*) Dr. Tran diagnosed cervicalgia[2] with symptoms of cervical brachial neuritis.[3] (*Id.*) He recommended rest and icing, prescribed analgesics and muscle relaxants, and referred Plaintiff to physical therapy. (*Id.*) Dr. Tran imposed work restrictions of no repetitive lifting more than two pounds with his left arm for four weeks. (Tr. 234.)

Plaintiff underwent an initial physical therapy evaluation on September 5, 2007. (Tr. 258-60.) Plaintiff explained that he was repetitively lifting ten pounds when his symptoms began. (Tr. 258.) The goal was for Plaintiff to return to normal work duties after eight physical therapy sessions. (Tr. 260.) After two sessions of physical therapy, Plaintiff told Dr. Tran that his symptoms were unchanged. (Tr. 500-01.) Plaintiff was discharged from physical therapy later that month because he did not return after three sessions. (Tr. 510.) Subjectively, Plaintiff said his symptoms continued to be exacerbated by light duty repetitive work activity. (Tr. 510.) Objectively, Plaintiff was mildly improved. (Tr. 511.)

Plaintiff saw his former surgeon, Dr. Smith, on October 9, 2007, and described in detail the activity he was doing at work when he aggravated his neck, shoulder and arm pain. (Tr. 273.) Plaintiff was neurologically intact, with good strength and sensation, no pathological cord signs, twenty degrees extension, one inch short of chin on chest flexion, lateral bending thirty degrees and lateral rotation sixty degrees. (*Id.*)[4] Dr. Smith's diagnosis was possible functional syndrome.[5] (*Id.*)

---

[3] Cervical means pertaining to the neck and algia is a word termination denoting a painful condition. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 339, 49 (31st ed. 2007).

[4] Brachial means pertaining to the upper limb and neuritis means inflammation of a nerve. *Dorland's* at 247, 1282.

[5] Normal cervical range of motion is thirty degrees rotation, ability to touch chin to chest (flexion), fifty-five degrees extension, and forty degrees lateral bend. A. Chandrasekhar, M.D.,

Plaintiff had a cervical MRI on October 26, 2007. (Tr. 275.) The MRI indicated a solid appearing fusion at C5-6, mild annular bulging at C6-7 without neural impingement, subtle annular fissure or tear at C4-5, and slight spurring with mild foraminal narrowing but no neural impingement. (*Id.*) Because there was nothing compressing Plaintiff's spinal cord or the exiting nerve roots of his neck, Dr. Smith recommended nonoperative rehabilitation. (Tr. 274.)

Dr. Tran referred Plaintiff to Dr. Teresa Gurin at Minnesota Orthopaedic Specialists, where he was evaluated on December 12, 2007. (Tr. 372, 498.) Plaintiff complained of pain in his neck, shoulder blades, arm, and low back. (*Id.*) He was taking ibuprofen, tramadol and cyclobenzaprine for pain relief. (*Id.*) The medications were effective when he was inactive but any activity, including physical therapy, caused him pain. (*Id.*) Plaintiff also reported symptoms of anxiety, shortness of breath, and pain radiating into his left arm if he walked eight blocks or more. (Tr. 373.) The abnormal findings from Plaintiff's examination were muscle and sacroiliac joint tenderness, hip and plantar flexion contracture[6], lumbar hyperlordosis,[7] and poor posture. (Tr. 374-75.) Dr. Gurin recommended restrictions of light duty work, alternate position every thirty minutes for ten to thirty minutes, and restrict lifting to five to ten pounds. (Tr. 375.)

---

Method of Exam, Loyola University Medical Education Network available at
http://www.meddean.luc.edu/lumen/meded/medicine/pulmonar/pd/pstep20.htm

[6] Functional disorder is a disorder of physiological function having no known organic basis. *Dorland's* at 557.

[7] Contracture is a condition of fixed high resistance to passive stretch of a muscle, resulting from fibrosis of the tissues supporting the muscles or the joints. *Dorland's* at 417.

[8] Lordosis is a concave portion of the spinal column as seen form the side, also called saddleback or swayback. *Dorland's* at 1090. Hyperlordosis is extremely marked lordosis. *Id.* at 904.

When Plaintiff saw Dr. Gurin on January 23, 2008, he had pain in his lower back with sitting or lying in bed, and pain in his arms, particularly with overhead activity and carrying groceries. (Tr. 367.) He had significant pain exacerbation with his work activities, lifting a big pad of paper checks, taking the pad to another machine to cut it into smaller pieces, and straining forward to inspect the checks. (*Id.*) On examination, Plaintiff had several tender muscle groups. (*Id.*) Dr. Gurin prescribed MS Contin. (Tr. 370.) She limited Plaintiff to lifting five pounds. (Tr. 371.) About two weeks later, Plaintiff said his pain had not improved with MS Contin, and it made him sleepy. (Tr. 362.) Activity, including household chores, aggravated his pain. (*Id.*) Dr. Gurin, however, now felt Plaintiff could lift ten pounds. (Tr. 365.) At the end of January 2008, Plaintiff saw Dr. Tran for hypertension. (Tr. 493-95.) Dr. Tran noted, "He has very active lifestyle, and exercise[] regularly without any problems." (Tr. 494.)

Plaintiff began physical therapy at Reynolds Rehabilitation on February 8, 2008. (Tr. 289-90.) Therapist John Reynolds could not find a specific pathology of Plaintiff's neck, but Plaintiff had some discomfort in the rhomboids and paraspinals. (Tr. 289.) The goal was for Plaintiff to have normal painless function in his back, neck and shoulders in three to four weeks. (*Id.*) On March 3, 2008, Plaintiff demonstrated good progress with shoulder and core strength. (Tr. 283.)

Dr. Gurin noted Plaintiff was getting stronger, but he said his pain had not changed. (Tr. 358.) Plaintiff's shoulder pain was worse after he shoveled snow. (*Id.*) He was no longer taking MS Contin. (*Id.*) On March 5, 2008, Dr. Gurin changed Plaintiff's lifting restriction to fifteen pounds. (Tr. 361.) Reynolds wrote to Dr. Gurin that day, reporting that after six physical therapy visits, Plaintiff had good, pain-free range of motion in the neck, shoulders and lumbar spine, with improved endurance and core stabilization. (Tr. 413.) Reynolds would discharge Plaintiff from physical therapy after one

more visit. (*Id.*) Reynolds opined that Plaintiff might benefit from returning to work, part-time initially because he fatigued quickly in the paraspinal muscles. (Tr. 282.) On March 17, 2008, Dr. Gurin amended Plaintiff's work restrictions, indicating Plaintiff was able to push/pull thirty pounds using an air table. (Tr. 357.)

On March 21, 2008, however, Plaintiff told Dr. Gurin he was worse after working four-hour shifts at his regular work station. (Tr. 353.) Dr. Gurin recommended an ergonomic workplace evaluation. (*Id.*) Later that week, Plaintiff told Dr. Tran that physical therapy had not been helpful to him. (Tr. 490.) Plaintiff's examination was normal with the exception of some tenderness. (Tr. 491.) Dr. Tran referred Plaintiff to a neurologist. (*Id.*)

Plaintiff returned to Dr. Gurin on April 30, 2008, reporting that he recently had some tingling sensations in his left arm when walking. (Tr. 348.) He was not working and was using Advil to manage his pain. (*Id.*) Dr. Gurin gave Plaintiff work restrictions of working two hours per day, maximum thirty to forty pounds lifting, and alternate activities every thirty to sixty minutes. (Tr. 351.) About a week later, Plaintiff saw a neurologist, Dr. Suraj Ashok Muley at Fairview Maple Grove Clinic. (Tr. 488.) Plaintiff was working part-time again. (Tr. 489.) His examination was normal, with the exception of mildly increased reflexes in the arms. (*Id.*) Dr. Muley opined that Plaintiff had developed a chronic pain syndrome, but the pain might also be mechanical in nature. (*Id.*) Although there was no evidence of a neurological basis for pain, Dr. Muley suggested that Plaintiff could try treatment with Neurontin. (*Id.*) He also recommended participation in a pain management program. (*Id.*)

At the end of May 2008, Dr. Gurin increased Plaintiff's working hours to four hours per day for two weeks, then increase to six hours per day for two weeks, then seven hours per day for two

weeks, and then full-time work.  (Tr. 347.)  Plaintiff's lifting restriction remained at thirty to forty pounds, and he would need to alternate positions every thirty to sixty minutes.  (*Id.*)  Dr. Gurin also instructed Plaintiff to refrain from strenuous activity at home, because he reported sharp pain in his right shoulder after lifting a box.  (Tr. 344.)  On June 3, 2008, Dr. Maya Miley at Fairview Hiawatha Clinic noted that Plaintiff's neck pain was under control and improving, and Plaintiff was returning to part-time work.  (Tr. 483-86.)  She prescribed Lyrica because Plaintiff could not tolerate Neurontin.  (Tr. 486.)  At the end of July 2008, Plaintiff was doing a little better after completing physical therapy.  (Tr. 340.)    On August 20, 2008, Plaintiff had pain between his shoulder blades, mid and low back.  (Tr. 335.)  Plaintiff was restricted to alternating activities every thirty to sixty minutes, and no highly repetitive activity or far reaching.  (Tr. 338.)  He did not take pain medication until after getting home from work due to side effects.  (Tr. 335.)

Plaintiff was no longer working when he saw Dr. Gurin on October 29, 2008.  (Tr. 330.)  He complained of chronic neck pain and pain between the shoulders.  (*Id.*)  If he did housework for any length of time, he had low back pain.  (*Id.*)  He was neurologically intact but had the same tenderness on examination as Dr. Gurin had noted on previous examinations.  (*Id.*)  Plaintiff returned to physical therapy a month later, having forgotten how to do his home exercises.  (Tr. 308-09.)  He complained of upper and lower back pain.  (*Id.*)  By December, Plaintiff's function had improved considerably since restarting therapy.  (Tr. 305.)  He had full range of motion in the neck and back.  (*Id.*)

When Plaintiff saw Dr. Gurin on December 17, 2008, he did not feel he was making progress in physical therapy, but his therapist disagreed.  (Tr. 325.)  His medications kept his pain tolerable.  (*Id.*)  A few days later, Plaintiff said he went shopping without any pain, and he no longer had a tingling feeling in his arms when carrying grocery bags.  (Tr. 299.)  He did not use a cervical collar

during his typing class as often; and he was looking for a desk job in the real estate field.  (*Id.*)  He no longer had back pain from cleaning his bathtub or ironing shirts.  (*Id.*)  After performing a push/pull activity, Plaintiff said he could do it all day.  (*Id.*)  Plaintiff  felt "pretty good" the next time he shoveled snow.  (Tr. 294.)

On January 12, 2009, Plaintiff did not have any symptoms after doing errands and driving to his physical therapy appointment.  (Tr. 292.)  He said he did not have any symptoms after grocery shopping and shoveling snow over the weekend.  (*Id.*)  A few days later, Plaintiff did the following physical therapy activities without apparent difficulty:  cycling for thirteen minutes, rowing, bicep curls, work hardening circuits with lifting and carrying forty-three pounds, pushing and pulling fifty pounds, carrying twenty pounds in each hand, squatting and stooping to retrieve things off the floor.  (Tr. 291.)  Nonetheless, a week later Plaintiff told Dr. Gurin he had not noticed much improvement.  (Tr. 321.)  He said his pain increased with  bending over, sitting or carrying light weight items.  (*Id.*)  If he was not active, Advil, Flexeril and Zanaflex eliminated some of his pain.  (*Id.*)

Plaintiff had a neurological consultation on January 22, 2009, with Dr. David Ketroser at Physicians Spine Care.  (Tr. 438-40.)  Plaintiff had normal strength, bulk and tone in all major muscle groups, normal sensory examination, normal coordination, station and gait, and normal reflexes.  (Tr. 439.)  His neck range of motion was as follows: seventy flexion, forty extension, forty right lateral bending, thirty to thirty-five left lateral bending, seventy right rotation, and eighty left rotation.  (*Id.*)  There was no evidence of radiculopathy or a facet etiology for Plaintiff's pain.  (*Id.*)  Dr. Ketroser opined the pain was probably discogenic.  (*Id.*)

Plaintiff was next evaluated, on March 9, 2009, by Dr. Timothy Garvey at Twin Cities Spine Center.  (Tr. 431.)  Dr. Garvey recommended that Plaintiff have another MRI done, and in the

meantime, continue treatment with light active exercise, aerobic conditioning, and upper and lower extremity strengthening. (*Id.*) About a week later, Dr. Gurin gave Plaintiff work restrictions for full-time work, lifting up to forty pounds, alternating activity every thirty to sixty minutes, no highly repetitive activity involving neck extension, flexion, rotation, and "no far reaching for now." (Tr. 578.)

Plaintiff had a cervical MRI on March 31, 2009. (Tr. 565-66.) The MRI showed mild degenerative changes at C4-5, and lesser changes at C6-7 above and below the fusion. (Tr. 460.) Given Plaintiff's left-sided symptoms, he could consider a left C7 selective nerve block. (*Id.*) Dr. Garvey recommended Plaintiff have discography for surgical evaluation but advised that surgery should be a last resort. (Tr. 379.) Plaintiff had above average pain response to discography. (Tr. 378.) The test results were difficult to interpret. (*Id.*)

Plaintiff returned to Dr. Gurin on May 13, 2009, complaining of neck, shoulder, and low back pain. (Tr. 313-16.) Plaintiff's neck pain increased when he used a computer. (Tr. 313.) His physical examination was normal, with the exception of tenderness on examination and a positive Spurling test.[8] (Tr. 314-15.) Dr. Gurin maintained Plaintiff's previous work restrictions. (*Id.*) One month later, Dr. Garvey opined that surgery was not in Plaintiff's best interest, but he could have an ameliorative discogram for surgical evaluation. (Tr. 463-64.) Plaintiff elected to proceed, and the discogram resulted in pain relief. (Tr. 465.) Based on Plaintiff's MRI and the discogram, Dr. Garvey opined that Plaintiff could have a C3-4 discectomy and fusion, but there was a risk of long term degeneration at other levels. (Tr. 428-29.) Dr. Garvey recommended active range of motion

---

[9] A positive Spurling's test occurs when a patient's radicular symptoms are produced by bending the neck laterally. David A. Morton, III, M.D., *Social Security Disability Medical Tests*, Vol. 1 § 1.24.1.

strengthening, and surgery as a last resort. (Tr. 428.) He suggested that Plaintiff keep his head in an upright posture, minimize prolonged flexion and rotation, minimize whole body vibration, occasionally lift twenty-five to forty pounds from the waist to shoulder, and limit lifting above shoulder level while working. (Tr. 429.)

Plaintiff's next medical record is almost one year later. On May 27, 2010, Plaintiff told Dr. Maya Miley at Hiawatha Family Practice that he wanted to lose weight but activity caused him pain. (Tr. 479-80.) Dr. Miley recommended swimming or riding a stationary bike. (Tr. 480.) The following month, a state agency consultant, Dr. Aaron Mark, reviewed the medical records in Plaintiff's social security disability file, and determined that Plaintiff had the capacity for light work with the following restrictions: limited push and pull in the upper extremities, never climb ladders, ropes or scaffolds; limited reaching; and no prolonged strained neck positions. (Tr. 525-32.) Upon reconsideration of Plaintiff's application for disability benefits, Dr. Steven Richards reviewed Plaintiff's social security file on August 9, 2010. (Tr. 541-43.) He affirmed Dr. Mark's opinion. (*Id.*)

Plaintiff saw Dr. Angela House at Hiawatha Family Practice on November 30, 2010, to establish care, get a medication refill, and have a disability form completed for a student loan. (Tr. 547-48.) Plaintiff reported being in pain almost every day, particularly with reaching and rotation with his left arm. (Tr. 547.) He could not do any activity for more than ninety minutes to two hours. (*Id.*) Sitting forward caused cramps in his shoulder blades. (*Id.*) His activities included watching television, listening to the radio, cutting grass and shoveling snow. (*Id.*) He took ibuprofen and Flexeril only once in a while because they made him feel sluggish. (*Id.*) Plaintiff also said his wife would be retiring the next week. (*Id.*) They recently went to Las Vegas. (*Id.*) On examination,

Plaintiff did not appear to be in pain. (*Id.*) Dr. House referred Plaintiff for physical therapy, and recommended that his back specialist fill out his disability form. (Tr. 548.)

Plaintiff next saw Dr. House for a preventative health visit on December 21, 2010. (Tr. 544-46.) His left arm and shoulder pain were interfering with his sleep; and his neck became stiff if he tilted his head while reading. (Tr. 545.) When he overused his arm, it tingled. (*Id.*) Plaintiff's neurological examination was normal. (*Id.*) Dr. House could not detect a musculoskeletal defect. (*Id.*) She gave Plaintiff a sports medicine referral for completion of his disability paperwork, but she would complete the disability paperwork if the referral source would not. (Tr. 546.)

When Plaintiff was treated for a cough almost a year later, on September 10, 2011, he complained of back pain. (Tr. 551-53.) There was no tenderness on musculoskeletal examination, and neurological examination was normal. (Tr. 553.)

## C.    Administrative Hearing

Plaintiff, represented by counsel, testified at a hearing before an ALJ on November 17, 2011. (Tr. 25-49.) Plaintiff is married and has two children and seven stepchildren, but their children no longer live with them. (Tr. 29-30.) Plaintiff has a bachelor's degree in business management. (Tr. 30.) He last worked in July 2008, and then received one month severance pay. (Tr. 31.) His work ended after he had three relapses of pain. (Tr. 39.) Plaintiff had a worker's compensation claim and received benefits until April 2010, when he settled for a lump sum. (Tr. 31.)

Plaintiff shoveled snow and mowed his lawn slowly, taking breaks as needed. (Tr. 32-33, 47.) He helped with housework by cleaning bathrooms, mopping, vacuuming, washing clothes, and shopping for groceries. (Tr. 33.) When he was not in pain, he tried to do as much as he could. (Tr. 48.) When he was in pain, he had to take breaks. (Tr. 48-49.) Plaintiff played dominoes for

entertainment but his neck and back became stiff after leaning forward for ninety minutes. (Tr. 35.) He took Advil and tramadol for pain, but not every day. (Tr. 36-37.)

Plaintiff said he cannot work due to pain in his neck, upper back, between the shoulder blades, and sometimes in his lower back. (Tr. 40.) He cannot walk more than four or five blocks because he begins to feel a weakness in his left arm. (Tr. 41.) He cannot drive for more than ninety minutes. (*Id.*) He cannot lift above his shoulders. (Tr. 43.) He can sit with a pillow behind his head for about an hour before he has to get up and walk around. (Tr. 42.)

Dr. Frank Indihar[9] testified as a medical expert at the hearing. (Tr. 49-52.) After August 2008, Plaintiff had a discography with concordant pain at cervical discs 3 to 4 and 6 to 7. (Tr. 49.) Plaintiff was status post C6 to 7 fusion with neck pain and left upper extremity pain, but negative neural exam. (Tr. 49-50.) Plaintiff was also diagnosed with lumbosacral sprain, also called mechanical low back pain. (Tr. 50.) Dr. Indihar testified that Plaintiff did not meet or equal Listing 1.02 or 1.04. (Tr. 50-51.) He believed Plaintiff would be restricted to sedentary work, with further limitations of no climbing ladders, ropes or scaffolds, and no static neck positions. (Tr. 51.) He would also be limited to occasional overhead reaching and no work at hazardous heights. (*Id.*)

Mitchell Norman testified at the hearing as a vocational expert. (Tr. 52-53.) The ALJ described a hypothetical person, fifty-five years old with a B.A. degree, and past relevant work as in the vocational report. (Tr. 53, 230.) The hypothetical person had the impairments described by Dr. Indihar, and could perform sedentary work limited to lifting five to ten pounds, sitting six out of eight hours, and being on his feet two out of eight hours, but limited to one hour at a time sitting or being on his feet. (Tr. 53.) He could only occasionally lift overhead, and he was precluded from repetitive

---

[11] The hearing transcriber identified the medical expert as Dr. Frank Enderheart but in the ALJ's decision, the ALJ identified the medical expert as "Dr. Frank J. Indihar." (Tr. 12.)

head rotation, neck flexion or prolonged static neck positions.  (*Id.*)  Norman testified such a person could perform Plaintiff's past work as a parking supervisor, as described and performed by Plaintiff, but not as described in the Dictionary of Occupational Titles.  (*Id.*)

### D.   ALJ's Decision

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.   The claimant engaged in substantial gainful activity during the following periods: 08/2007 through 08/2008 (20 CFR 404.1520(b) and 404.1571 *et seq.*).
. . .

3.   However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.   The claimant has the following severe impairments: cervical disc disease, status post cervical fusion with continued neck and left upper extremity pain and mechanical low back pain.  (20 CFR 404.1520(c)).
. . .

5.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).
. . .

6.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with one hour maximum either sitting or on his feet (walking/standing); occasional overhead work; and no work that involves repetitive head rotation, neck flexion, or prolonged static neck positions.
. . .

7.   The claimant is capable of performing past relevant work as a parking lot supervisor as he performed it.  This work does not require the performance of work-related activities precluded by

the claimant's residual functional capacity.  (20 CFR 404.1565).

. . .

8.  The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2007, through the date of this decision. (20 CFR 404.1520(f)).

(Tr. 14-19.)

## III.   CONCLUSIONS OF LAW

### A.   Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

### B.   Discussion

Plaintiff is proceeding *pro se*, therefore, the Court interprets his submissions liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1977)). Plaintiff raises three arguments: 1) the ALJ discriminated against him based on race; 2) the ALJ conducted the hearing improperly; and 3) the ALJ erred in finding Plaintiff could perform his past relevant work because pain precludes him from any employment. Plaintiff also alleges a right to counsel in this proceeding.

First, there is no constitutional or statutory right to counsel in federal civil cases. *Farmer v. Hass*, 990 F.2d 319, 323 (7th Cir. 1993). Second, there is nothing in the record, beyond Plaintiff's conjecture, that the ALJ denied Plaintiff benefits based on race or ethnicity. *See Bishop v. Barnhart*, 78 Fed. Appx. 265, 269 (4th Cir. 2003) (per curiam) (finding no merit to the claimant's allegation that the ALJ violated his constitutional right to equal protection).

Third, ALJs are presumed to be unbiased, and a plaintiff must produce sufficient evidence to overcome the presumption. *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir. 2011). To establish bias, the claimant must show the ALJ's behavior, in the context of the whole case, "was 'so extreme as to display clear inability to render fair judgment.'" *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)). Plaintiff contends the ALJ 'took matters into his own hands" and instructed the witnesses in their answers. (Pl's Mot.) [Doc. No. 11.]

The ALJ questioned Plaintiff, and allowed Plaintiff's counsel to question Plaintiff, about his general background, work background, medical impairments and treatment, functional limitations, and daily activities. (Tr. 29-49.) The ALJ asked Plaintiff to explain the "main reason" he could not work, and whether there were any other reasons. (Tr. 40-41.) The ALJ allowed Plaintiff's counsel to ask follow up questions. (Tr. 44-49.) Then, the ALJ asked the medical expert, Dr. Indihar, to describe any impairments Plaintiff had that were reflected in the administrative record. (Tr. 49.) The ALJ

asked Dr. Indihar whether Plaintiff met or equaled a listed impairment. (Tr. 50.) The ALJ asked for Dr. Indihar's opinion of Plaintiff's functional restrictions. (Tr. 51.) The ALJ interrupted Dr. Indihar's testimony to ask whether it was his opinion that Plaintiff could perform sedentary work for an eight-hour day. (Id.) It appears, however, that the ALJ was only seeking clarification because Dr. Indihar had already testified that he would restrict Plaintiff to sedentary work. (Id.)

When Dr. Indihar said that he would restrict Plaintiff from working at "hazardous heights," the ALJ commented that a sedentary job probably would not require that, and Dr. Indihar agreed. (Tr. 51-52.) The ALJ allowed Plaintiff's counsel to question Dr. Indihar, but counsel had no questions. (Tr. 52.) The ALJ posed a hypothetical question to the vocational expert, Mitchell Norman, incorporating the physical impairments and functional limitations described by Dr. Indihar. (Tr. 53.) The ALJ then allowed Plaintiff's counsel to ask Norman questions and to make a closing statement. (Tr. 53-54.) Counsel did neither. (Id.)

The Court concludes, in the context of the whole case, Plaintiff has not shown that the ALJ's behavior displayed a clear inability to render a fair judgment. The ALJ gave Plaintiff, represented by counsel, every opportunity to present his case and examine witnesses. The ALJ did not direct the witnesses how to answer. Dr. Indihar independently reviewed Plaintiff's medical records, testified about the impairments identified in the records, and rendered his opinion about the functional limitations caused by those impairments. The ALJ also gave Plaintiff's counsel the opportunity to ask the vocational expert questions. There is no evidence of ALJ bias.

Plaintiff's remaining claim is that his pain precludes him from any employment. The ALJ's determination that Plaintiff could perform his past relevant work is based on the ALJ's RFC finding for sedentary work, with an hourly change of position from sitting to standing or walking; occasional

overhead work; and no work that involves repetitive head rotation, neck flexion, or prolonged static neck positions.

"The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)). The RFC determination must be based on "some medical evidence". *Id.* (*quoting Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984) (quoting Social Security Ruling ("SSR") 82-58) (emphasis in original).

In his RFC analysis, the ALJ first considered Plaintiff's written function reports, and his testimony that pain precludes him from working. (Tr. 16.) The ALJ concluded, however, that Plaintiff's pain and resulting limitations were not as severe as alleged. (*Id.*) The ALJ found that the objective medical evidence and Plaintiff's course of treatment were inconsistent with his subjective

complaints. (*Id.*) Although Plaintiff had neck surgery in 2006, the surgery was generally successful. (Tr. 16-17.) Plaintiff suffered neck pain at work in August 2007, but his MRI showed good decompression and solid fusion. (Tr. 17.) Plaintiff continued to work at a level of substantial gainful activity through August 2008. (*Id.*)

Plaintiff told Dr. Gurin, in October 2008, that his pain was causing him to limit his activities. (Tr. 17.) Plaintiff's physical examination, however, was normal, with the exception of pain with palpation to the neck, back and shoulders. (*Id.*) Dr. Gurin told Plaintiff he could return to work with restrictions of lifting up to forty pounds, no highly repetitive activity, and alternate activity every thirty to sixty minutes. (*Id.*) Plaintiff did not return to work and continued to complain of pain. (*Id.*) Plaintiff saw a spine specialist, Dr. Timothy Garvey, in August 2009. (*Id.*) Plaintiff had provocative and ameliorative discograms, which together suggested Plaintiff might get pain relief from another surgery. (*Id.*) Dr. Garvey gave Plaintiff work restrictions to hold his head in an upright position, minimize prolonged flexion and rotation of his neck, minimize body vibration, and lift a maximum of twenty-five to forty pounds from shoulder height. (*Id.*)

The ALJ found significant gaps in Plaintiff's treatment records. (*Id.*) In November 2010, Plaintiff had a normal physical examination, reported that he recently vacationed in Las Vegas with his wife, and asked the physician to complete a disability report for his student loan. (*Id.*) The physician declined to complete the form. (*Id.*)[10] Plaintiff attended another medical appointment in December 2010, complaining of shoulder and back pain, but his musculoskeletal examination did not show any defects. (*Id.*) His next medical appointment was not until September 2011. (*Id.*)

---

[11] The ALJ did not recognize that Dr. House said she would complete the disability form if Plaintiff could not have it completed elsewhere. (Tr. 546.)

The ALJ next considered the various medical opinions of Plaintiff's work limitations. (*Id.*) The ALJ gave significant weight to Dr. Indihar's opinion because he reviewed Plaintiff's social security disability file through the date of the hearing, he was a specialist in Internal Medicine with special knowledge in assessing disability, and his opinion was consistent with the objective medical findings. (Tr. 17-18.) The ALJ placed some weight on Dr. Gurin's opinions of Plaintiff's work restrictions, noting that after Plaintiff stopped working, Dr. Gurin actually decreased Plaintiff's work restrictions. (*Id.*) The ALJ also gave Dr. Garvey's August 2009 opinion some weight, but the ALJ gave Plaintiff greater work restrictions based on Plaintiff's subjective complaints and other evidence. (*Id.*) Finally, the ALJ gave some weight to the state agency medical consultants' opinions but gave Plaintiff greater work restrictions based on evidence submitted after the consultants reviewed the record. (*Id.*)

The ALJ found Plaintiff's work history of competitive full-time employment supported Plaintiff's credibility. (*Id.*) This, however, did not overcome the absence of objective evidence that Plaintiff's pain was disabling. (*Id.*) The ALJ found Plaintiff's daily activities consistent with the residual functional capacity finding. (*Id.*) Plaintiff could use public transportation, drive, shovel snow, walk, cut grass with breaks, clean the house, and grocery shop. (*Id.*) Based on the vocational expert's testimony, the ALJ found Plaintiff could perform his past relevant work as a parking lot supervisor, as Plaintiff actually performed the job. (Tr. 19.)

This Court agrees that the minimal objective findings of muscle tenderness and mild to moderate cervical disc degeneration do not support Plaintiff's allegation of severe pain precluding all employment. Subjective pain complaints, however, cannot be discredited based solely on lack of objective findings because pain cannot be objectively measured. Thus, the issue is whether substantial evidence in the record as a whole supports the ALJ's credibility analysis. Courts should defer to an

ALJ's credibility finding when the ALJ gives good reasons supported by substantial evidence. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

The ALJ's credibility determination was based on Plaintiff's ability to return to substantial gainful employment for a period after his August 2007 work injury, gaps in Plaintiff's treatment records, daily activities, and the opinions of Plaintiff's treating physicians, the medical expert, and state agency consulting physicians. The fact that Plaintiff performed substantial gainful activity through August 2008 precludes disability only through August 2008. The Court must still consider whether Plaintiff's subjective complaints were credible from August 2008 through the date of the ALJ's decision. The ALJ acknowledged that Plaintiff's work history was a positive factor, but the ALJ gave good reasons, as discussed below, to find Plaintiff's subjective complaints not fully credible.

Treating physician opinions are "generally entitled to substantial weight." *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009)). After August 2008, Plaintiff's treating physicians opined that Plaintiff could work full-time with restrictions very similar to those adopted by the ALJ in his RFC finding. Apart from several short-term greater work restrictions, Dr. Gurin believed Plaintiff could work full-time if he limited lifting to thirty to forty pounds, alternated activities every thirty to sixty minutes, with no highly repetitive activity involving neck extension, flexion or rotation. In August 2009, Dr. Garvey recommended that Plaintiff hold his head in an upright position, minimize prolonged flexion and rotation of his neck, minimize body vibration, and lift a maximum of twenty-five to forty pounds from shoulder height. After reviewing all of the evidence in the record and listening to the testimony at the hearing, Dr. Indihar opined that Plaintiff could perform sedentary work limited to lifting five to ten pounds, change of position from sitting or being on his feet every hour, occasionally lift overhead, and no repetitive head

rotation, neck flexion or prolonged static neck positions. The ALJ agreed with Dr. Indihar's opinion, giving Plaintiff a much greater lifting restriction than even his treating physicians recommended. The ALJ included in the RFC an hourly change of position and the postural limitations suggested by the treating physicians. Thus, the treating physicians' opinions support the ALJ's credibility finding.

The ALJ also discounted Plaintiff's subjective complaints based on his daily activities. Plaintiff regularly told his physicians that any activity aggravated his pain. Plaintiff did housework, grocery shopped, mowed the law, and shoveled snow. When Plaintiff saw Dr. Tran for hypertension in January 2008, Dr. Tran noted "He has very active lifestyle, and exercise[] regularly without any problems."

Plaintiff told his physicians, on a number of occasions, that he had little improvement from physical therapy. The records from his physical therapy show the contrary. In February 2008, after six physical therapy visits, Plaintiff had good, pain-free range of motion in the neck, shoulders and lumbar spine, with improved endurance and core stabilization. When Plaintiff returned to work in 2008, he stopped doing his physical therapy home exercises. After he stopped working and went back to physical therapy in October 2008, he had forgotten how to do his exercises. Although Plaintiff denied it to his physicians, his physical therapy records reflect his great progress starting in December 2008. For example, he reported that when he shoveled snow the way his therapist had showed him, it felt pretty good. Plaintiff's improvement with physical therapy, and his ability to perform a significant variety of household chores support the ALJ's credibility determination.

Finally, the ALJ discounted Plaintiff's credibility because he had gaps in his treatment records. *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (significant gaps in medical treatment are inconsistent with complaints of persistent and disabling pain). After Dr. Garvey recommended active

range of motion strengthening and advised Plaintiff that surgery should be a last resort to treat his pain, Plaintiff did not seek any treatment for almost a year. Then, Plaintiff did not see a physician for another six months. He reported that he only took ibuprofen or Flexeril once in while because it made him sluggish. *See Wagner v. Astrue*, 499 F.3d 842, (8th Cir. 2007) (ALJ properly discounted subjective complaints where plaintiff took no pain medication on a regular basis). He also said he recently enjoyed a trip to Las Vegas. After that, Plaintiff did not seek medical treatment for another ten months. Plaintiff's limited use of pain medication and gaps in treatment provide additional support for the ALJ's credibility analysis. In sum, the ALJ's credibility analysis and his RFC finding are supported by substantial evidence in the record including objective medical evidence, physicians' opinions, course of treatment, and daily activities.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (#11, 12) **be denied.**

2.      Defendant's Motion for Summary Judgment (#15) **be granted;**

3.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED:  August 20, 2013


 *s/Franklin L. Noel*
FRANKLIN L. NOEL
Unites States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before September 4, 2013, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting

party's brief within 14 days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A district court judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.